# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Katia Guimaraes,

                            Plaintiff,

                                              Civ. No. 10-366 (RHK/JSM)
                                              **MEMORANDUM OPINION AND ORDER**

v.

SuperValu, Inc.,

                            Defendant.

Clayton D. Halunen, Halunen & Associates, Minneapolis, Minnesota, for Plaintiff.

Julie A. Fleming-Wolfe, Fleming-Wolfe Law Office, St. Paul, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Katia Guimaraes brings this employment-discrimination action against her former employer, SuperValu, Inc. ("SuperValu"). She alleges national-origin discrimination, retaliation, and creation of a hostile work environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*, as well as retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*[1] SuperValu now moves for summary judgment. For the reasons set forth below, the Court will grant its Motion.

---

[1] Guimaraes also initially brought a claim for interference with her rights under the FMLA (Count II), but she has voluntarily dismissed that claim. (Mem. in Opp'n 3 n.2.)

# BACKGROUND

SuperValu is a nationwide grocery retailer and wholesaler with its corporate headquarters in Eden Prairie, Minnesota. Guimaraes is a native of Brazil. She applied for a skilled workers' program in Canada and was hired as a Sales Representative by Kraft Foods Canada in 2003. In October 2005, she accepted a position as an Assistant Category Manager for Albertson's, Inc., a grocery company headquartered in Boise, Idaho. Guimaraes's reviews rated her as a solid performer who met expectations and took initiative. SuperValu acquired part of Albertson's in June 2006, and after the acquisition, SuperValu centralized its merchandising teams in Eden Prairie. Guimaraes was offered (and accepted) a position as a Category Manager for SuperValu, and she relocated to Minnesota in the spring of 2007.

In 2008, SuperValu implemented "SUPERFusion," an initiative designed to centralize merchandising decisionmaking to its Eden Prairie headquarters. Titles and job descriptions changed, and new positions were created to reflect increased responsibilities at the centralized location. SuperValu's management structure following SUPERFusion is as follows: each specific product category has a Business Development Manager (BDM), a Business Support Manager (BSM), and a Business Support Specialist (BSS). The BDM is responsible for developing and carrying out business plans for the product category, and the BSM and BSS assist and report to the BDM. In turn, each BDM reports to a Director. As part of SUPERFusion, Guimaraes became the BSM for the Print Media/Checkout division of the General Merchandising / Home Health and Beauty

Department (GM/HHB).  She reported to BDM Michael Kimrey, and Kimrey reported to Lanny Hoffmeyer, the Director of General Merchandise.

Guimaraes was working in the United States under an H-1B visa.[2]  In early 2008, her visa had to be renewed, so SuperValu re-posted her BSM position.  Hoffmeyer reviewed all of the applications for the position and determined that there was not a more qualified U.S. citizen who had applied for the position.  Thus, Guimaraes kept her job as a BSM for SuperValu and the company continued to sponsor her visa.

In May 2008, Kimrey moved to another position and Guimaraes began reporting to Lisa Grubbs,[3] who was promoted to the BDM of Print Media/Checkouts in the GM/HHB.  Guimaraes had been previously introduced to Grubbs shortly after Grubbs began working for the company in January 2008.  According to Guimaraes, when Hoffmeyer introduced the two, he commented that they might be able to converse in Spanish because Grubbs was from Mexico.  Guimaraes responded that Portuguese is the language spoken in Brazil, and Grubbs replied that she only spoke a little Portuguese.  Guimaraes also recalls Grubbs inviting her to lunch after they met, where they talked about their experiences growing up in Mexico and Brazil.

On May 29, 2008, shortly after she began reporting to Grubbs, Guimaraes had her first SuperValu performance evaluation.  Because Grubbs had just started supervising Guimaraes, Hoffmeyer conducted the evaluation.  He ranked her as "Consistently Meets

_____

[2] An H-1B visa allows a non-citizen to remain and work in the United States with an employer's sponsorship.

[3] At the time, Lisa Grubbs was known as Lisa Bautista, and that name appears in some of the records.  For ease of reference, the Court refers to her as Grubbs throughout.

and Often Exceeds Expectations" in the categories of "Seek[ing] Customer Satisfaction"
and "Show[ing] Initiative and Commitment," and as "Consistently Meets Expectations"
in all other performance categories. (Am. Fleming-Wolfe Decl. Ex. 6.) Guimaraes
received an overall performance rating of "Consistently Meets Expectations." (Id.) As
part of the review, Guimaraes also ranked herself as "Often Exceed[ing]" or
"Consistently Exceed[ing]" expectations in nearly every category. (Id.) Her next review
was scheduled for the following June, and she received a 9.14% merit increase effective
June 1, 2008. The May 2008 review was Guimaraes's last scheduled annual review
before her termination on May 15, 2009.

When Guimaraes began reporting to Grubbs, the two agreed to an open and honest
working relationship where each was receptive to the other's feedback. However, by
July 2008 their relationship was deteriorating. Guimaraes felt Grubbs was assigning her
tasks that Grubbs as BDM should be handling herself, as well as tasks the BSS should
complete; she also believed Grubbs was setting unreasonable deadlines. Guimaraes
informed Grubbs of her concerns, and (according to Guimaraes) Grubbs was "insult[ed],"
responding "I would never tell my boss what you're telling me right now." (Guimaraes
Dep. 49–50.) Guimaraes also met with Hoffmeyer, explaining that she felt Grubbs's
expectations and behaviors were inappropriate.[4] Hoffmeyer agreed to meet with
Guimaraes and Grubbs to discuss the situation and clarify their roles and responsibilities.

---

[4] Guimaraes points to a number of different behaviors she felt were inappropriate, including
Grubbs walking away when speaking to Guimaraes, asking Guimaraes to repeat herself in front
of coworkers and vendors, and demanding that Guimaraes complete tasks that should have been
completed by Grubbs herself.

Grubbs allegedly bragged to Donna Roberts that she glared at Hoffmeyer through the window while he was meeting with Guimaraes and acted purposefully "cold" towards him in an attempt to get Hoffmeyer to take Grubbs's side. (Roberts Aff. ¶ 5.)

On August 19, 2008, Guimaraes and Grubbs met with Hoffmeyer. Guimaraes believed the meeting was to address her work relationship with Grubbs; instead, it focused on Guimaraes's confusion about her responsibilities as a BSM. Hoffmeyer felt Guimaraes had been "virtually self-managed" under her former BDM, so he viewed the meeting as an opportunity to provide guidance and direction. (Hoffmeyer Dep. 57–58.)

Guimaraes continued to believe Grubbs was harassing and discriminating against her. She identifies the following behaviors and incidents: Grubbs often acted like she could not understand Guimaraes when Guimaraes was speaking and asked her to repeat herself in personal conversations as well as in front of coworkers and vendors. (Guimaraes Dep. 53–54.) Sometimes Grubbs asked Guimaraes to recite back verbatim things Grubbs told her. (Id. 97–98.) When Guimaraes asked Grubbs questions, Grubbs would respond "you should know the answer" and fail to provide further direction. (Id. 178–79.) Grubbs occasionally walked away from Guimaraes in the middle of conversations, sometimes rolling her eyes or smirking. (Id. 57, 91.) Grubbs provided unreasonably short timelines for projects she assigned to Guimaraes and then criticized Guimaraes for failing to meet these deadlines. (Id. 48, 103.) Grubbs reprimanded Guimaraes for failing to complete a project that Grubbs had never relayed to her. (Id. 78.) On at least one occasion, Grubbs instructed the BSS not to help Guimaraes complete a task, even though it required the BSS's skill-set. (Id. 62–66.) Grubbs assigned tasks to

Guimaraes that should have been done by the BSS.  (Id. 45, 136.)  Beginning in

September 2008, Grubbs excluded Guimaraes from vendor meetings and then assigned

follow-up tasks to Guimaraes without giving her the relevant information needed to

complete them.  Additionally, Grubbs often refused to meet with Guimaraes, claiming to

be too busy even though she had time to meet with the BSS on a daily basis.  (Id. 53, 55.)

Guimaraes believed Grubbs was doing all these things intentionally to set her up for

failure.  (Id. 60–61, 76, 244–45.)

Sometime in September or October of 2008, Grubbs went to lunch with Donna

Roberts.[5]  According to Roberts, at this lunch:

> [Grubbs] told me that she was targeting Katia Guimaraes, and that she was
> trying to get Katia fired and stop Katia's green card process.  Even though
> [Grubbs] had only been working with Katia for a brief period of time—a
> matter of months—she told me that she was setting in motion a process to
> terminate Katia.  [Grubbs] even complained to me about how long it would
> take to terminate Katia.

(Roberts Aff. ¶ 4.)  When Roberts suggested that Grubbs instead try to work with

Guimaraes, Grubbs "completely dismissed this suggestion" and ignored her for weeks

following the lunch.  (Id. ¶ 6.)

Meanwhile, Grubbs's concerns with Guimaraes's performance continued.  In early

October, Grubbs met with Richele Butler, the HR Business Partner who oversaw the

---

[5] Roberts no longer works for SuperValu.  She was terminated on March 12, 2009, the same day
she complained to the company's Vice President that she felt Grubbs was retaliating against her
and had discriminated against Guimaraes.  According to SuperValu, Roberts's termination
occurred because she called Grubbs a "bitch" to another coworker, in addition to previous
insubordinate and inappropriate comments.  (Second Leland Decl. Ex. O).  The circumstances
surrounding Roberts's termination are not at issue here, however, and the Court accepts the facts
set forth in her affidavit in support of Guimaraes.

HHB merchandising team, to discuss these concerns. (Butler Dep. 168–72.) Before anything was done to address her performance, however, Guimaraes went to HR to complain that Grubbs was discriminating against her. She met with HR Business Partner Katie Held on October 15, 2008, and reported Grubbs's allegedly discriminatory behavior. Held passed this on to Butler, who met with Guimaraes on October 23, 2008. According to Guimaraes, she described the behaviors and incidents listed above and told Butler that she felt Grubbs was discriminating against her because of her accent and because she was from Brazil. Butler's notes from her meetings with Held and Guimaraes corroborate Guimaraes's complaints about Grubbs's management and unreasonable expectations, but they mention nothing about national origin or Guimaraes's accent. Rather, they state "Katia feels retaliated against for giving feedback." (Am. Fleming-Wolfe Decl. Exs. 11, 12.) Butler agreed to follow up on Guimaraes's concerns.

Guimaraes disputes whether Butler's follow-up investigation was thorough. Butler asserts she met with Hoffmeyer and Grubbs shortly after Guimaraes's complaint, ostensibly to discuss the reported discrimination. However, the only HR meetings concerning Guimaraes that Hoffmeyer recalls involved her performance; he does not recall meeting about allegations of discrimination. (Hoffmeyer Dep. 72, 83.) Butler did not speak to the BSS who worked with Guimaraes and Grubbs or to any other coworkers while investigating Guimaraes's claims. (Butler Dep. 54–64.) Ultimately, Butler concluded that there was not sufficient evidence of discrimination, but she made no written findings or conclusions. (Id. 324–26.) However, she did hold a mediation session with Guimaraes and Grubbs in hopes of helping the two communicate better.

After investigating Guimaraes's discrimination complaints, Butler proceeded to address Guimaraes's performance with Grubbs. They developed a Performance Action Plan ("PAP"), and Butler and Grubbs met with Guimaraes on November 11, 2008, to discuss it. A PAP is designed to identify a SuperValu employee's performance problems and facilitate improvement. As Guimaraes's direct supervisor, Grubbs was solely responsible for determining whether a PAP was necessary and for identifying the areas in need of improvement. Moreover, Grubbs was responsible for determining whether Guimaraes was showing progress under the PAP.

Guimaraes's PAP identified the following areas where her performance was lacking: "prioritizing of tasks and projects, meeting deadlines, lack of communication and coordination of activities . . . with vendors, complete and timely follow through of tasks, and being professionally receptive to feedback on performance." (Am. Fleming-Wolfe Decl. Ex. 8.) The PAP laid out an "action plan" with specific steps Guimaraes should take to improve, such as replying to all e-mails that require a response within one business day, breaking projects or tasks into smaller pieces to better prioritize and take ownership and responsibility, and completing ad/promo responsibilities timely and accurately with direction from Grubbs. (Id.) It also included the following direction:

> Be receptive to feedback and treat [Grubbs] with respect, which includes not talking back . . . and taking [her] direction and recommendations with respect. For example, saying you know how to prioritize and communicate effectively because you have more experience than [Grubbs] demonstrates disregard to [Grubbs's] recommendations on helping to improve your performance. [You] need to be less defensive and take [Grubbs's] direction respectfully.

(Id.)  Guimaraes disputes the performance deficiencies reflected on her PAP and believes she was performing her job well.  The PAP also included the following:

> **This Plan constitutes a warning to the associate**: The consequence of a performance trend that does not meet the minimum requirements of the job and sustain improvement in overall contributions and behavior will lead [to] further disciplinary action up to and including termination.

(Am. Fleming-Wolfe Decl. Ex. 8 (emphasis in original).)  Both Guimaraes and Grubbs signed the PAP on November 12, indicating they had reviewed it (but not necessarily that they both agreed with its contents).  A follow-up review was scheduled for December.

On December 12, Grubbs and Butler again met with Guimaraes to deliver a second PAP.  The summary on the new PAP provided: "Since our last conversation there has not been a significant improvement in the issues below."  (Id. Ex. 14.)  It then laid out the same areas for improvement and action plan as Guimaraes's first PAP.  Guimaraes signed the second PAP, but she included lengthy written comments, stating: "I am greatly concerned about the statements made in this report."  (Id.)  She said she had "made great effort to comply with the requests in the [first] performance action plan," and pointed out that her past performance reviews (which she attached) had included many positive comments.  (Id.)  She also reiterated some of her complaints about Grubbs.  Guimaraes felt she "was not provided with a benchmark" to improve her performance and that "the statements made in [the PAP] are solely based on [Grubbs's] perception and therefore are complete[ly] partial."  (Id.)  However, Guimaraes's comments did not mention her concern that Grubbs was discriminating against her.

On January 14—five days before her next scheduled performance evaluation on January 19—Guimaraes applied for an FMLA leave of absence, claiming "chronic diarrhea," "sleeplessness," "loss of appetite" and "weight loss," and "general disinterest in life" as a result of stress at work. The healthcare-provider certification Guimaraes submitted with her request for leave indicates she had been diagnosed with depression and was unable to work. Guimaraes's leave was later extended into March.

While Guimaraes was on FMLA leave, SuperValu was forced to "plan[] reductions in some areas" due to economic conditions. (Am. Fleming-Wolfe Decl. Ex. 15.) According to Butler, the GM/HHB merchandising team was directed to reduce administrative expenses by $800,000. (Butler Dep. 292.) On January 29, 2009, an announcement was made to GM/HHB about department reorganization.[6] Guimaraes was still on FMLA leave at the time. SuperValu identified five positions in HHB for elimination: one Director, two BDMs, and two BSMs. Of these five positions, one BDM position and one BSM position were already open, so only three employees would be impacted. (Am. Fleming-Wolfe Decl. Ex. 15.) The Director whose position was identified for elimination was Kristen Reber, who was reclassified as a BDM but continued working for SuperValu.[7] The BDM position eliminated was held by Vicki McHargue, who was offered an open BSM position that became available when Amy

_____

[6] SuperValu characterizes the reorganization as a reduction in force. However, Guimaraes disputes this, pointing out that only three positions were cut and she was the only employee whose employment with the company was actually terminated. Thus, for purposes of this Motion, the Court refers to it simply as a "reorganization."

[7] Reber had previously been on a PAP, and SuperValu allegedly had concerns about her performance. However, no disciplinary action was currently in progress for Reber when the reorganization decisions were made. (Am. Fleming-Wolfe Decl. Ex. 15.)

Thie was shifted into Guimaraes's old BSM position.[8]  Guimaraes was identified as the

impacted BSM.  Grubbs played no role in identifying the positions or employees to be

eliminated; the decisions were made by higher-level management.

Guimaraes was notified of her termination on February 20, 2009.  In a business-

condition summary describing the reorganization, SuperValu explains its decision to

terminate Guimaraes as follows:

> We analyzed the BSM population by performance and service dates.  We
> only looked at FY08 performance ratings and any current performance
> issues.  Then we looked at service date.

> Based on this analysis, we identified Ms. Katia Guimaraes as the impacted
> associate.  Ms. Guimaraes received disciplinary action in November and
> December for not meeting expectations in her role as a BSM. . . . To date,
> we are not aware of any improvement in Ms. Guimaraes'[s] performance.
> Ms. Guimaraes is the only BSM currently on disciplinary action.  Though
> there are less tenured BSMs in HHB than Ms. Guimaraes, their
> performance meets expectations.

(Am. Fleming-Wolfe Decl. Ex. 15.)  The summary also indicated that the HHB

reorganization was a "volume reduction."  (Id.)

Guimaraes was allowed to complete her FMLA leave before her termination

notice period began.  Her leave ended on March 16, 2009, at which point her 60-day

notice period began to run (during which she was not working but received full pay).

Guimaraes identified a BSM opening in the grocery department with the same job duties

as her previous BSM job and asked to be restored to that position.  However, Butler

responded that the grocery BSM position was not deemed equivalent to the GM/HHB

---

[8] McHargue had taken FMLA leave from October 20, 2008, to December 9, 2008.

BSM position and the company "do[es] not slot associates across departments." (Leland

Decl. Ex. R.) Guimaraes's employment with SuperValu ended on May 15, 2009.

Meanwhile, shortly after the reorganization was announced to GM/HHB,

Hoffmeyer moved Roberts into Guimaraes's position as BSM for Print Media/Checkouts

while Guimaraes was still on leave. (Roberts Aff. ¶ 13.) When Roberts met with Grubbs

to discuss this transition, Roberts averred that Grubbs said, "I can't believe I told you all

of those things about [Guimaraes] now that you're going to be reporting to me," which

Roberts "understood" to refer to Grubbs's earlier statement about targeting Guimaraes.

(Id. ¶ 15.) On February 11, 2009, Roberts met with Butler and expressed concern that

Grubbs was now targeting her because she knew how Grubbs had treated Guimaraes.

Roberts did not feel that Butler adequately addressed her concerns. (Roberts Aff. ¶ 28.)

Thus, on March 12, 2009, Roberts e-mailed the Vice President of Center Store

Merchandising, Rich Juliano, relaying all of her concerns (including Grubbs's comments

about trying to fire Guimaraes and stop her green-card process) to him. Later that same

day, Roberts was terminated.[9]

This action followed. SuperValu now moves for summary judgment on each of

Guimaraes's claims.

### STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett,

---

[9] The circumstances surrounding Roberts's termination are outlined above. See supra note 4.

477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

### I.     National-Origin Discrimination

Guimaraes claims she suffered discrimination based on her national origin which violated both Title VII of the Civil Rights Act (Count VI) and the MHRA (Count III). Title VII provides that it is "unlawful employment practice for an employer . . . to fail to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of [her] . . . national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the MHRA provides that "it is an unfair employment practice for an employer, because of . . . national origin . . . to . . . discharge an employee or discriminate against a person." Minn. Stat. § 363A.08, subd. 2. Claims under Title VII and the MHRA are analyzed using the same standard. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005); Hoover v. Nw. Private Mortg. Banking, 632 N.W.2d 534, 542 (Minn. 2001).

Guimaraes can show that she was discriminated against through either direct or indirect evidence. E.g., Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 809–10 (8th Cir. 2007). Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). Alternatively, in the absence of direct evidence, a discrimination claim is analyzed using the familiar burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).

### a. *Direct Evidence*

To prove discrimination by direct evidence, a plaintiff must proffer "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir. 1993) (internal quotations omitted). Here, Guimaraes claims that Grubbs's statement "that she was trying to get [Guimaraes] fired and stop her green card process" is direct evidence reflecting discriminatory intent. (Roberts Aff. ¶ 4.) She argues that this comment directly relates to her "foreign-born" status and thus constitutes direct evidence of Grubbs's discriminatory attitude. (Mem. in Opp'n 30.) In the Court's view, however, this is not direct evidence of discrimination. Guimaraes acknowledges that the comment refers to citizenship rather than national origin (see id.), and discrimination based on one's citizenship is not equivalent to national-origin discrimination under Title VII. See Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 95 (1973) ("Aliens are protected from

illegal discrimination under [Title VII], but nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship.").

Moreover, the green-card comment does not actually attribute Grubbs's desire to get Guimaraes fired to her alien status. Grubbs is not alleged to have said she was trying to get Katia fired "*because she wanted to*" stop her green-card process or "*because of*" her green-card status; instead, she said she was "trying to get Katia fired *and* stop her green-card process." (Roberts Aff. ¶ 4.) Because Guimaraes was in the United States on an H-1B visa which required an employer's sponsorship, losing her job would necessarily impact her green-card status. Grubbs's reference to this fact does not evince a causal link between Guimaraes's national origin and Grubbs's alleged desire to get her fired.

Cases with much more "direct" evidence of discriminatory animus than this case have been deemed properly analyzed under <u>McDonnell Douglas</u>. <u>E.g.</u>, <u>Hossaini v. W. Mo. Med. Ctr.</u>, 97 F.3d 1085, 1088 (8th Cir. 1996) (finding Title VII claims properly analyzed under <u>McDonnell Douglas</u> where plaintiff alleged that her manager yelled at her "why [is] everything so different with you damn foreigners" and criticized her for "not taking vacation time like American employees"). Grubbs's one reference to Guimaraes's green-card process does not rise to the level of direct evidence of discrimination. <u>See</u> <u>Twymon v. Wells Fargo & Co.</u>, 462 F.3d 933, 934 (8th Cir. 2006) (facially race-neutral evidence was not sufficient direct evidence for a claim of race discrimination).

**b.    *Indirect Evidence***

Because Guimaraes does not present direct evidence of discrimination, the Court will evaluate her claim in accordance with <u>McDonnell Douglas</u>. To establish a *prima*

*facie* case, Guimaraes must show that: (1) she was a member of a protected class, (2) she was qualified for her position, (3) she was subject to adverse employment action, such as termination, and (4) similarly situated non-class members were not subject to the adverse action. E.g., Colenburg v. Starcon Int'l., Inc., 619 F.3d 986 (8th Cir. 2010). But when an employer has proffered the legitimate, non-discriminatory reason required at step two of McDonnell Douglas, the Court may skip the *prima facie* case and move directly to the question of discrimination *vel non*. E.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Riser v. Target Corp., 458 F.3d 817, 820–21 (8th Cir. 2006). Here, SuperValu has given a legitimate, non-discriminatory reason for placing Guimaraes on a PAP: her performance.[10] The Court thus moves directly to the last step of the McDonnell Douglas analysis.

At that third and final step, Guimaraes must proffer sufficient evidence to create a genuine issue whether discriminatory reasons actually motivated the adverse action. E.g., Colenburg v. Starcon Int'l., Inc., 656 F. Supp. 2d 947, 961 (D. Minn. 2009) (Kyle, J.) aff'd 619 F.3d 986 (8th Cir. 2010). Stated differently, she must show that SuperValu's reason is mere pretext for discrimination. She may do so by showing that its explanation is "unworthy of credence," or "that a [prohibited] reason more likely motivated [SuperValu]." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006).

---

[10] The proffered reason for Guimaraes's ultimate termination is that she was the only BSM on a PAP at the time of the reorganization. Guimaraes acknowledged at oral argument that she was selected for termination because she was the only BSM on a PAP; however, the adverse action she challenges as discriminatory was being placed on the PAP. Thus, the Court focuses on the PAP as the adverse action for purposes of Guimaraes's national-origin discrimination claim, rather than her later termination as a result of the PAP.

Guimaraes argues that SuperValu's reason lacks credence due to the rapid change in her performance evaluations—indeed, her performance "M[et] Expectations" as of May 2008 (when Grubbs first began supervising her), yet she was placed on a PAP six months later. She further argues that she suffered discrimination because Grubbs (who was allegedly targeting Guimaraes to get her fired because of her national origin) was solely responsible for identifying Guimaraes's performance deficiencies and placing her on the PAP which led to her termination. Indeed, if Grubbs's actions—namely, criticizing Guimaraes's performance and implementing her PAP—were due to her national origin, SuperValu could not insulate itself from responsibility simply because Grubbs did not make the final decision to terminate her. See Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir. 1993) ("An employer cannot escape responsibility for willful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to [discriminate]."). Yet, Guimaraes has produced no evidence linking Grubbs's actions to her national origin.

As discussed above, Grubbs's statement about Guimaraes's green card does not evince national-origin discrimination.[11] The only other conduct even potentially linked to Guimaraes's national origin is Grubbs asking Guimaraes to repeat herself or smirking and walking away during conversations, allegedly because of her accent. Yet, while Grubbs acknowledges that she sometimes asked Guimaraes to repeat or rephrase to clarify her

---

[11] Guimaraes argued at length at the November 19th hearing that a reasonable jury could conclude that Grubbs's reference to her green card necessarily referred to "where [she] came from"—her Brazilian national origin. In the Court's view, however, this link is too attenuated and speculative to sustain Guimaraes's claim, particularly in the absence of any other evidence that Grubbs's actions were motivated by discriminatory animus related to national origin.

points, there is no evidence that Grubbs ever made <u>any</u> reference to Guimaraes's accent. A comment that Grubbs would like to fire Guimaraes and stop her green-card process and requests that she repeat or rephrase statements (without any reference to her accent) "do not demonstrate pretext or create a reasonable inference of discrimination, as the comments do not suggest a discriminatory animus without resorting to speculation." <u>Takele v. Mayo Clinic</u>, 576 F.3d 834, 839 (8th Cir. 2009) (a comment that plaintiff's success was like a thousand monkeys getting together to write the Bible, abruptly stopping conversations when plaintiff approached, and vague references to "foreigners" did not demonstrate pretext or raise an inference of discrimination).

Guimaraes has not put forth sufficient evidence to allow a jury to conclude that her national origin more likely motivated her placement on the PAP that ultimately led to her termination than SuperValu's proffered explanation—her performance.[12]  There is ample evidence that Grubbs and Guimaraes did not get along and often disagreed about how the other was performing her respective job duties.  However, there is no material question whether Grubbs's criticisms of Guimaraes's performance were discriminatorily motivated.  Guimaraes's deposition is replete with bald assertions that she was being "treated differently" and suffering "discrimination"; however, when asked what Grubbs

---

[12] At oral argument, Guimaraes pointed to <u>Evenson v. Maytag Appliances Sales Co.</u>, Civ. No. 02-1688, 2003 WL 21273453 (D. Minn. May 27, 2003) (Kyle, J.), arguing it is "almost exactly the same case."  However, <u>Evenson</u> is not the "same case."  Evenson (who claimed age discrimination) identified numerous comments by his supervisor explicitly referencing the old ages of coworkers, expressing a preference for working with younger people, and directly calling the plaintiff an "old guy."  <u>Id.</u> at *6.  This pattern of facts evinced a link between the adverse action to Evenson's protected status.  Conversely, Guimaraes points to only one comment referencing her green card and being asked to repeat herself.  Unlike <u>Evenson</u>, there is no direct reference to her national origin, nor a pattern of comments indicating discriminatory motive.

said or did to make her think she was being treated differently because of her national origin, she said only that Grubbs "frequently ask[ed] [her] to repeat [her]self" and acted as though she didn't understand her. (Guimaraes Dep. 87–88.) Guimaraes admits that Grubbs never made a single negative or derogatory statement about the fact she was from Brazil. (Id. 92.) "The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." Pineda v. UPS, 360 F.3d 483, 487 (5th Cir. 2004). In this Court's view, Guimaraes has failed to create a genuine issue whether SuperValu's reason for placing her on a PAP and ultimately terminating her—poor performance—was pretextual. Accordingly, her national-origin discrimination claims fail.

## II.    Hostile Work Environment

Guimaraes next claims she was subject to a hostile work environment because of her national origin, again invoking both Title VII (Count VII) and the MHRA (Count IV). "Title VII also prohibits an employer from subjecting its employees to a hostile work environment 'because of such individual[s'] . . . national origin.'" Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005). To make out a *prima facie* hostile-work-environment claim, she must show: (1) she was a member of a protected group, (2) she was subject to unwelcome harassment, (3) there was a causal nexus between the harassment and her membership in the group, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known about the harassment and failed to take prompt and effective remedial action. Turner v. Gonzales, 421 F.3d 688, 695 (8th Cir. 2005). A claim is actionable only if the conduct at

issue is "so severe or pervasive as to alter the conditions of the [plaintiff's] employment and create an abusive working environment." <u>Frieler v. Carlson Mktg. Group, Inc.</u>, 751 N.W.2d 558, 571 n.11 (Minn. 2008). This is because employment-discrimination statutes are not intended to "create a general civility code." <u>Shaver v. Indep. Stave Co.</u>, 350 F.3d 716, 721 (8th Cir. 2003). "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." <u>Id.</u>

In evaluating whether Guimaraes's work environment was sufficiently hostile to survive summary judgment, the Court must evaluate the totality of the circumstances. <u>Goins v. W. Group</u>, 635 N.W.2d 717, 725 (Minn. 2001). This includes "the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Arraleh v. Cnty. of Ramsey</u>, 461 F.3d 967, 979 (8th Cir. 2006). It is an objective standard. <u>Howard v. Burns Bros., Inc.</u>, 149 F.3d 835, 840 (8th Cir. 1998). In other words, Guimaraes must show that a reasonable person would find challenged conduct sufficiently severe or pervasive to alter the conditions of her employment and create an abusive environment, not merely that <u>she</u> found it hostile.

In support of her claim, Guimaraes points to the following conduct by Grubbs: acting as though she didn't understand Guimaraes, asking her to repeat herself, rolling her eyes or smirking, and walking away from conversations. But a hostile work environment exists only where "the conduct complained of [is] extreme in nature and not merely rude or unpleasant." <u>Carpenter v. Con-Way Cent. Express, Inc.</u>, 481 F.3d 611, 618 (8th Cir. 2007); <u>accord</u> <u>Gipson v. KAS Snacktime Co.</u>, 171 F.3d 574, 579 (8th Cir.

1999) (claim limited to "extreme work conditions"). This is a "demanding" standard, Arraleh, 461 F.3d at 979, and one that Guimaraes has failed to meet here.

The conduct Guimaraes identifies was allegedly "constant" over a series of months. (Mem. in Opp'n 41.) Despite its frequency, however, there is no evidence that Grubbs's conduct towards Guimaraes was ever physically threatening in any way. See Colenburg, 656 F. Supp. 2d at 959 (conduct may have been inappropriate and offensive, but it was not physically threatening). Friction between coworkers and even displays of some hostility may sometimes occur in a workplace, yet "[n]ot every such occurrence can be attributed to unlawful discrimination," especially where there is no reference made to the plaintiff's membership in a protected class. Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F. Supp. 977, 983 (W.D.N.Y. 1996). Grubbs's actions of ignoring Guimaraes, smirking and rolling her eyes, or walking away during conversations may indeed have been offensive. However, Title VII "is not a shield against harsh treatment at the work place." Jackson v. City of Killeen, 654 F.2d 1181, 1186 (5th Cir. 1981).

Moreover, even if the conduct were sufficiently severe or pervasive, there is no evidence of a causal link between the alleged harassment and Guimaraes's national origin. In fact, Guimaraes herself admitted that at least some of Grubbs's "hostile" behavior began after Guimaraes criticized her management style in July 2008. (Guimaraes Dep. 45–47.) This suggests that even if Grubbs was disrespectful and demanding, her behavior was not motivated by Guimaraes's national origin but by differing work styles or simply a personality clash. See Valdez v. Mercy Hosp., 961 F.2d 1401, 1403 (8th Cir. 1992) ("Clearly there were personality conflicts between [plaintiff]

and [others, including his supervisor], during his term of employment . . . but these conflicts, even taken with [his supervisor's] ethnic humor, did not rise to the level of severity or pervasiveness necessary to demonstrate a discriminatorily hostile work environment actionable under Title VII.")  "Title VII does not prohibit discrimination on the basis of personality."  Jones v. Jones Bros. Constr. Co., 716 F. Supp. 1122, 1124 (N.D. Ill. 1989), aff'd, 888 F.2d 1215 (7th Cir. 1989).

In the Court's view, Guimaraes has shown that Grubbs's behavior may well have been "rude, abrasive, unkind, or insensitive," see Shaver, 350 F.3d at 721; however, it was not sufficiently severe or pervasive to support a hostile-work-environment claim, and there is no causal nexus between the "hostile" conduct and Guimaraes's national origin.

## III.    Retaliation / Reprisal

Additionally, Guimaraes alleges both retaliation in violation of Title VII (Count VIII) and reprisal in violation of the MHRA (Count V).  Title VII prohibits employers from taking adverse action against an employee in retaliation for reporting discrimination or harassment.  42 U.S.C. § 2000e-3(a).  Although the MHRA uses the term "reprisal" rather than "retaliation," MHRA claims are analyzed in the same fashion as claims under Title VII.[13]  See, e.g., Carraher v. Target Corp., Civ. No. 05-2385, 2006 WL 2882345, at *7 n.13 (D. Minn. Oct. 5, 2006) (Kyle, J.), aff'd, 503 F.3d 714 (8th Cir. 2007); Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999).  A retaliation claim is separate from any underlying discrimination alleged; "as long as a plaintiff had a

---

[13] Because the analysis of MHRA and Title VII claims is the same, the Court refers to these claims collectively as Guimaraes's "retaliation" claims.

reasonable, good faith belief that there were grounds to claim discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006); accord Buettner v. Arch Coal Sales Co., 216 F.3d 707, 714 (8th Cir. 2000) ("A finding of unlawful retaliation . . . is not conditioned on the merits of the underlying discrimination complaint.")

Like Guimaraes's other claims, retaliation claims are evaluated using McDonnell Douglas. See, e.g., Wallace, 442 F.3d at 1119; Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 548 (Minn. 2001). To establish a *prima facie* case of retaliation, she must show that (1) she took part in protected conduct, (2) she was subject to an adverse employment action, and (3) there is a causal nexus between the protected conduct and the adverse action. See Wallace, 442 F.3d at 1119 (citing Hesse v. Avis Rent A Car Sys., Inc., 393 F.3d 624, 632 (8th Cir. 2005)). As with the national-origin discrimination claim, because SuperValu has articulated a legitimate reason for Guimaraes's termination, the Court assumes she has established a *prima facie* case and addresses only whether she has created a genuine issue on pretext. See Aikens, 460 U.S. at 715; Riser, 458 F.3d at 820–21.

As the Eighth Circuit has explained, "[a]n inference of a causal connection between a charge of discrimination and [an adverse employment action] can be drawn from the timing of the two events, but *in general more than a temporal connection is required* to present a genuine factual issue on retaliation." Arraleh, 461 F.3d at 977–78 (internal quotations omitted) (emphasis added). The protected conduct here (Guimaraes

23

reporting that she was being discriminated against) first occurred in October 2008. Her placement on a PAP occurred on November 11, 2008. Guimaraes points to this temporal proximity as evidence that her placement on a PAP (which ultimately resulted in her termination) was retaliation against her reporting discrimination by Grubbs. However, while temporal proximity may support a *prima facie* case, it is generally <u>insufficient</u> to prove pretext, particularly in the absence of any other evidence. <u>See id.</u>

Since Guimaraes proffers no evidence linking her placement on a PAP to her report of discrimination other than temporal proximity, she raises no genuine issue that SuperValu's stated reason was a pretext for retaliation.

## IV.    FMLA Retaliation

The FMLA allows an eligible employee to take up to 12 weeks of unpaid leave during a 12-month period. 29 U.S.C. § 2612. It also prohibits an employer from discriminating against an employee for asserting her rights under the Act. 29 U.S.C. § 2615(a)(2); <u>accord</u> <u>Darby v. Bratch</u>, 287 F.3d 673, 679 (8th Cir. 2002). "Basing an adverse employment action on an employee's use of [FMLA] leave . . . is therefore actionable." <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 832 (8th Cir. 2002). The fact that Guimaraes took FMLA leave is not in dispute here, nor are the circumstances surrounding her leave. At issue is her claim that SuperValu's decision to terminate her was, in some part, retaliation for her taking FMLA leave.

Like the discrimination claims discussed above, an FMLA retaliation claim is analyzed using <u>McDonnell Douglas</u>. <u>See</u> <u>Wallace v. Sparks Health Sys.</u>, 415 F.3d 853, 860 (8th Cir. 2005). "To establish a *prima facie* case of FMLA retaliation, an employee

24

must show [1] that she engaged in activity protected under the Act, [2] that she suffered an adverse employment action by the employer, and [3] that a causal connection existed between the employee's action and the adverse employment action." <u>Darby</u>, 287 F.3d at 679 (citation omitted). In the Court's view, Guimaraes cannot establish a *prima facie* case because she lacks any evidence of a causal connection between her taking FMLA leave and SuperValu's decision to terminate her.[14]

Guimaraes argues her termination was retaliatory because two of the three employees whose positions were eliminated—herself and Vicki McHargue—had taken FMLA leave in 2008. (Mem. in Opp'n 48). Yet other facts undercut this assertion. As Guimaraes points out elsewhere, McHargue actually was <u>not</u> terminated; she continued to work for SuperValu, albeit as a BSM instead of a BDM. SuperValu justified selecting McHargue as the impacted BDM based on experience and seniority, without any reference to the fact she took FMLA leave.[15] Guimaraes also acknowledges that one other BSM considered for elimination along with her had also taken FMLA leave in 2008, yet that BSM was not terminated. (<u>Id.</u>) In short, there is insufficient evidence to support a connection between Guimaraes taking FMLA leave and her being chosen for termination during the HHB reorganization.

---

[14] Unlike Guimaraes's other claims, the adverse action for her FMLA-retaliation claim can only be her termination, rather than her placement on a PAP, as she was placed on both PAPs <u>before</u> taking FMLA leave.

[15] Guimaraes argues that another BDM, Jeni Keefe, should have been eliminated instead of McHargue because McHargue had been with the company longer; Keefe had begun working for SuperValu five days after McHargue. SuperValu did deviate slightly from strict seniority in deciding between the two employees, but it did so because McHargue had less experience in the field, and it determined she would be a good fit for other open opportunities within the company. (Am. Fleming-Wolfe Decl. Ex. 15.)

Moreover, even if Guimaraes could establish a *prima facie* case, she does not raise a genuine issue whether SuperValu's legitimate non-discriminatory reason for terminating her employment—the fact she was the only BSM on a PAP at the time of the reorganization—was a pretext for FMLA retaliation. The record is devoid of <u>any</u> reference to Guimaraes's FMLA leave (by Grubbs or any other manager) that could suggest that her leave impacted how she was treated. The mere fact that Guimaraes took FMLA leave before her employment was terminated is not sufficient to raise a genuine issue. Identifying two other HHB employees who took FMLA leave, one whose position was eliminated while the other's was not, is also insufficient. Guimaraes's FMLA retaliation claim must be dismissed.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that SuperValu's Motion for Summary Judgment (Doc. No. 30) is **GRANTED**; and Plaintiff's Complaint (attached to Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: December 8, 2010                          s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge